**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16-CV-07776 |
| | ) | |
| v. | ) | (No. 13 CR 694) |
| | ) | |
| NICACIO JAIMES-MORENO, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

On September 25, 2013, Defendant Nicacio Jaimes-Moreno was indicted on a charge that he knowingly transported a minor in interstate commerce with the intent that the minor engage in criminal sexual activity in violation of 18 U.S.C. § 2423(a). Shortly before the trial on that charge was scheduled to begin, Defendant Jaimes-Moreno pled guilty to a lesser charge of knowingly transporting an individual (not necessarily a minor) for the purpose of engaging in criminal sexual activity in violation of 18 U.S.C. § 2421(a). As a result of the plea deal, Jaimes-Moreno's potential sentence was capped at ten years, rather than at life, and he was sentenced on March 30, 2015 to a ten-year term. He now moves under 18 U.S.C. § 2255 to vacate the judgment against him, alleging that he was denied effective assistance of counsel. For the reasons outlined below, the defendant's claims fail to satisfy the test for ineffective assistance set forth in *Strickland v. Washington*, 466 U.S. 688 (1984), and its progeny. The defendant cannot show that his counsel's performance was deficient, and even if he could, he was not prejudiced by the representation he received. Accordingly, the motion is denied.

# I.    BACKGROUND

## A.    Defendant's Offense Conduct

In approximately 2006, the defendant lived in Mexico with his girlfriend, and Victim A, the daughter of his girlfriend. PSR at ¶ 11; GV at 1-2.[1] While living there, the defendant began to rape Victim A, who was a minor. PSR at ¶¶ 10-11; GV at 2. In 2007, the defendant moved to the United States illegally and arranged for Victim A to join him in Tulsa, Oklahoma. PSR at ¶ 12; GV at 2-3. In about May 2010, the defendant, Victim A, and Victim A's mother together moved from Oklahoma to Indiana.  PSR at ¶ 13; GV at 4. Next, the defendant moved Victim A and her mother with him to Illinois in August or September 2010, when Victim A was 15 years old.  R. 90 at 2; PSR at ¶ 13. Throughout their time in Oklahoma, Indiana, and Illinois, the defendant continued to rape Victim A. R. 90 at 2; PSR at ¶ 13; GV at 4-5.

## B.    Procedural History

### 1.    Criminal Charges

On August 28, 2013, the defendant was named in a criminal complaint charging him with knowingly transporting Victim A, a minor, in interstate commerce from Indiana to Illinois, with the intent that Victim A engage in sexual activity for which the defendant could be charged with a criminal offense, in violation of 18 U.S.C. § 2423(a). Cmplt., ECF No. 1. On September 19, 2013, the grand jury returned a one-count indictment charging the defendant with the same

---

[1]    Citations to the record of the proceedings in 13 CR 694 are designated by a brief description of the document where needed, followed by "ECF No.," followed by the applicable ECF document number and, if appropriate, page citation. References to transcripts begin with the date of the hearing transcribed, followed by the docket number of the transcript, and the page number of the cited portion. Citations to the Corrected Presentence Investigation Report, dated March 31, 2015, are to "PSR" with paragraph or page numbers. Citations to the government's version of defendant's offense—an attachment to defendant's PSR—are to "GV" followed by the page number. Citations to the record of the proceedings in this case are designated by the case number and docket number, and page number if needed ("16 CV 7776, ECF No. __, at __").

crime. Indictment, ECF No. 8. This charge carried a mandatory minimum term of imprisonment of ten years and a maximum term of imprisonment for life. Trial was set for October 27, 2014. ECF No. 47. As discussed further below, the defendant ultimately waived his right to a jury trial and requested a bench trial. ECF No. 59.

### 2.    *Motions to Substitute Counsel*

After the defendant's original counsel withdrew on November 14, 2013,[2] then, on or about December 11, 2013, the Court appointed the defendant's counsel, Ralph Schindler, who is the subject of the defendant's pending motion. *See* ECF Nos. 25-27, 41. Three months later, on March 12, 2014, the defendant filed a *pro se* motion seeking substitution of counsel on the basis that "an irreconcilable conflict" had arisen between the defendant and his counsel. ECF No. 31. During a March 26, 2014 hearing (ECF No. 42), the Court denied the defendant's motion after learning that the defendant's primary concern was that he wanted more communication with his counsel. 3/26/2014 Tr. (ECF No. 120) at 5-6. During the hearing, the defendant acknowledged that he had an opportunity to talk about issues with counsel, that counsel explained what counsel was doing, and that counsel's explanations answered the defendant's questions and concerns, but nevertheless maintained that he wanted to switch counsel. *Id*. at 4. The Court noted that counsel had "invested a substantial period of time on [the defendant's case] already" and that the general nature of the problem did not then warrant the appointment of new counsel. *Id*. at 6. Accordingly, the court denied the defendant's motion and directed both the defendant and his counsel "to work harder at working together productively," which the defendant agreed to do. *Id*. at 6-7. The court specifically advised the defendant that it would reconsider the need to appoint

---

[2] Defendant's original counsel, Neil Toppel, was granted leave to withdraw after he was hired as a supervisor in the Cook County Public Defender's Office only a month or so after being appointed. ECF No. 25.

different counsel if "Mr. Schindler and you continue to go down the road and you continue to have problems working together." *Id.* at 6.

Less than three months before trial, on August 4, 2014, the defendant again filed a *pro se* motion for substitute counsel. ECF No. 52. Among other things, the defendant's motion stated that "his attorney verbally promised the [the defendant] [a] 3-4 years sentence" based on counsel's apparent plea discussions with the government, but that the defendant "did not agree with the time." *Id.* at 2. The defendant also cited his concern about potentially facing new federal charges involving guns, as well as the defendant's concern about accepting a plea offer that could result in a 10-year sentence. *Id.* The Court held a hearing on the defendant's motion on August 21, 2014. ECF No. 59. During this dialog, the defendant complained that Mr. Schindler had told him that there was "nothing he could do" to help the defendant, but when the Court pressed the defendant to explain further, it became clear that the defendant's principal problem as to Mr. Schindler was not what he had done or failed to do to prepare for trial but rather his (Schindler's) inability to negotiate a better deal with the government. *Id.* at 7-9. With respect to the defendant's concerns, the Court confirmed that the government was entitled to its view of the case and that Mr. Schindler's duty as the defendant's counsel was to "assist you in defending against whatever charges the government brings at a trial if the government is unwilling to offer you a deal that is acceptable to you short of a trial. And from all that I can see in this case, . . . Mr. Schindler is doing exactly that. The court then cataloged for the defendant the types of actions that Mr. Schindler was making on his behalf:

> You're entitled to competent counsel, and everything I can see of Mr. Schindler's representation in that matter suggests that he is performing his duties competently, and that's an understatement because the record in this case reflects that he is very actively doing things necessary to defend against the charges that have been brought against you. He has secured the services of investigators, he has secured or is seeking to secure the services of expert witnesses, he has interviewed and

secured or has a motion pending that we'll address today to ensure that a number of witnesses for your defense are brought in from other locations at the government's expense. He has filed numerous motions to preserve your rights as guaranteed by the Federal Rules of Criminal Procedure. In short, Mr. Schindler's efforts in this case have been substantial, they have been appropriate in the view of the Court in terms of the kinds of activity that would be necessary to defend this case, and they are substantially in excess of the kinds of efforts that the court normally sees made in defending criminal cases.

8/21/2014 Tr. (ECF No. 117) at 6-7. The court denied the motion in the absence of any indication that the communication problems between the defendant and Mr. Schindler were preventing Mr. Schindler from preparing for trial or getting necessary information from the defendant. *Id*. at 10.

During the same hearing, the defendant confirmed that, as indicated by the motion filed by his attorney (ECF No. 56), he was seeking a bench trial. 8/21/2014 Tr. (ECF No. 117) at 14-15. In the ensuing colloquy to ensure that the defendant's waiver of his right to a jury trial was knowing and voluntary, the defendant noted that he was taking "three different psychiatric medications" at the time, which were being prescribed for him at the MCC. *Id*. at 17-18. In response to the court's questions, the defendant confirmed that the medications helped him to relax and to think more clearly and that there was no reason he could not go forward with an important decision like waiving his right to a jury trial. *Id*. at 19. After a full colloquy, the court accepted the defendant's jury trial waiver and entered an order setting the case for a bench trial. ECF No. 59.

### 3. *Guilty Plea*

A pretrial conference was scheduled on October 22, 2014. At the very outset of the conference, the defendant personally requested an opportunity to engage in further plea discussions with the government. 10/22/14 Tr. (ECF No. 114) at 2. Mr. Schindler explained that the mandatory minimum sentence of 10 years carried by the indictment had been the sticking

point in negotiations and the government indicated that it had offered to issue a superseding information charging a crime that carried a 10-year maximum sentence and eliminated the mandatory minimum. The court accommodated the defendant's request and delayed the start of the conference to give the parties an opportunity to confer further. Within about half an hour, the parties advised the Court that the discussion had been fruitful and that it was likely that the defendant would enter a plea of guilty to a superseding information charging a less serious crime than the indictment.

The following day, October 23, 2014, the defendant pled guilty pursuant to a written plea declaration to a one-count superseding information, which charged him with knowingly transporting Victim A in interstate commerce from Indiana to Illinois, with the intent that Victim A engage in sexual activity for which the defendant could be charged with a criminal offense, in violation of 18 U.S.C. § 2421. Superseding Information ("SSI"), ECF No. 87. The defendant acknowledged in his plea declaration that, at the time he moved Victim A to Illinois, she was under the age of 16 and he intended to continue his sexual conduct with her in a manner that constituted criminal sexual assault, *see* 720 ILCS 5/11-1.20; criminal sexual abuse, *see* 720 ILCS 5/11-1.50; and aggravated criminal sexual abuse, *see* 720 ILCS 5/11-1.60. Plea Dec., ECF No. 90 at 2. But, because under § 2421, the age of the person transported is not an element of the offense, that charge carries lesser penalties than does § 2423; the defendant's conviction on the § 2421 charged reduced the maximum term of imprisonment the defendant faced from life to ten years and eliminated the mandatory minimum term of imprisonment.

The defendant stated in his plea declaration that he had "read the charge against him contained in the superseding information, and that charge has been fully explained to him by his attorney." *Id.* at 1. The defendant also stated in his declaration that he fully understood the nature

and elements of the crime with which he was charged and understood that it carries a maximum sentence of 10 years imprisonment. *Id.* at 1-2. As to role of the Sentencing Guidelines, the defendant acknowledged that he "[understood] that in imposing sentence the Court will be guided by the United States Sentencing Guidelines," and "that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence." *Id.* at 3. The defendant further acknowledged that "the sentencing judge is neither a party to nor bound by this Plea Declaration and may impose a sentence up to the maximum penalties" [of 10 years]. *Id.* at 7. The defendant's declaration more specifically addressed the calculation of the applicable sentencing range under the Sentencing Guidelines:

> Based on the facts now known, the anticipated offense level is 25, which, when combined with the anticipated criminal history category of V, results in an anticipated Sentencing Guidelines range of 100 to 125 months imprisonment. Defendant and his attorney acknowledge that the above Guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may result in the conclusions that different or additional Guidelines provisions apply in this case. Defendant understands that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation.

*Id.* at 6.

The defendant further acknowledged that: (1) "no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Declaration, to cause defendant to plead guilty;" (2) "he has read this Plea Declaration and carefully reviewed each provision with his attorney;" and (3) "that he understands and voluntarily accepts each and every term and condition of this Plea Declaration." *Id.* at 11.

At the outset of the defendant's change of plea hearing, the defendant acknowledged that his responses to the court would be under oath and that he was required to tell the truth. Plea Tr., ECF No. 115 at 4-5. The defendant affirmed that he had adequate opportunity to discuss the

superseding charge with counsel and that he had no further questions that he needed to discuss with his attorney about the superseding information. *Id*. In response to the Court's questions, the defendant indicated that he does not communicate in English, has little schooling, and limited ability to read and write Spanish, but also confirmed that he had nonetheless gone over documents with his attorney and a translator and that the defendant was satisfied that he was given full information about those documents. *Id.* at 6-8.

While under oath at the October 23, 2014 change of plea hearing, the defendant advised the Court as follows concerning his competency to enter a plea:

| Court: | Are you presently taking any medications? |
|---|---|
| Defendant: | Yes. |
| Court: | What medications? |
| Defendant: | Three types of medications; psychiatric drugs and also for high blood pressure. |
| Court: | All right. Do any of those drugs affect your ability to understand what's going on? |
| Defendant: | No. |
| Court: | In fact, do those drugs help you to better understand and think clearly? |
| Defendant: | Yes. |
| Court: | Now, you said some of those drugs are psychiatric drugs. Are you presently being treated for any psychiatric or mental condition? |
| Defendant: | Yes. |
| Court: | What is the general nature of that problem? |
| Defendant: | The psychiatrists have not diagnosed me yet. We are in the evaluation process. |

| | |
|---|---|
| Court: | Is that a process that's begun while you have been in custody? |
| Defendant: | Yes. |

* * * * *

| | |
|---|---|
| Court: | Is there any reason, Mr. Moreno, that you do not feel that you are able mentally because of these psychiatric problems to make very important decisions that are going to affect your life? |
| Defendant: | No. |

* * * * *

| | |
|---|---|
| Court: | And you feel fully capable this morning of making important decisions? |
| Defendant: | Yes. |

*Id.* at 9-10. The Court asked the defendant's counsel whether, "based on [his] extensive interactions with the [the defendant]," counsel had "any reason to question his competence to waive indictment and enter a plea of guilty," to which counsel replied, "None, your honor. I believe he is more lucid today than he has ever been in his life." *Id.* at 11. The government likewise indicated that it had no reason to question the defendant's competence to waive indictment and to enter a plea of guilty. *Id.* The court thus found the defendant to be "competent to waive indictment and to enter a plea to the charge contained in the information." *Id.*[3]

At the change of plea hearing, the defendant confirmed his signature on the plea declaration and confirmed, in response to the Court's questions, that he had a full and adequate opportunity to review the plea declaration and to discuss it with his attorney and had no further

---

[3] At a subsequent point in the October 23, 2014 change of plea hearing, the defendant once again affirmed that the defendant had enough time to talk with his attorney about whether or not to plead guilty. Plea Tr., ECF No. 115 at 16. The defendant then again confirmed that there was nothing more that he wanted to discuss with his attorney before agreeing to plead to a superseding charge. *Id.*

questions. *Id.* at 22-23. The defendant further represented that the information set forth in the plea declaration was truthful and accurate. *Id.* at 23. In making his decision, the defendant acknowledged that no one forced him in any way to plead guilty and that he signed the declaration because he thought it was the best thing to do in view of his circumstances. *Id.* The defendant affirmed that no one promised him anything in order to convince him to plead guilty to the charge in the information and, specifically, that no one promised the defendant anything about his eventual sentence in his case. *Id.* at 23-24.

The defendant further told the court that he had spoken with his attorney about the Sentencing Guidelines, including an explanation that, based on the facts of the case and based on the defendant's criminal history category, the Guidelines would produce a recommended sentence. *Id.* at 24-25. The defendant acknowledged his understanding that the guideline range is only a recommendation that that is not binding on the Court. *Id.* at 25. The defendant further indicated to the Court his understanding of his potential sentence, as follows:

| | |
|---|---|
| Court: | All right. So do you understand that no one – [not] Mr. Schindler, not the government, not even me at this point–can tell you what your sentence in this case is going to be yet? Do you understand that? |
| Defendant: | Yes. |
| Court: | Your sentence could be anywhere from a very short sentence up to the 10-year maximum that the law allows on the charge that you wish to plead guilty. Do you understand that? |
| Defendant: | Yes. |
| | * * * * * |
| Court: | And until we go through that whole process, I will not make a determination of what your sentence is, so if anyone has told you that you can expect a sentence of 10 years or a sentence of two years, they're wrong, and you can't rely on that. Do you understand that? |

| | |
|---|---|
| Defendant: | Yes. |
| Court: | Because no one can tell you what your sentence is going to be because I haven't decided what your sentence is going to be. Do you understand? |
| Defendant: | Yes. |

*Id.* at 25-26.[4] The Court then explained the potential penalties and outcomes of a conviction and sentence, including that the defendant would be subject to deportation and that, "it would be highly likely that [the defendant] would be deported" after his sentence is served. *Id.* at 28-29.

Next, the defendant confirmed that the factual description in the plea declaration was accurate. *Id.* at 30. After the defendant's counsel stated those facts again on the record, which included the defendant's unlawful sexual contact with Victim A and the transport of Victim A from Indiana to Illinois in or about August 2010 with the intent to continue such unlawful sexual contact, the defendant told the Court that his attorney's description was accurate, noting that "Everything is fine[,] Everything," and that he did not disagree with those facts. *Id.* In response to the Court's questions, the defendant specifically admitted: that he had sexual relations with Victim A in Indiana when she was under the age of 16; that she remained under the age of 16 when they moved in 2010 to Illinois; that the defendant continued to have sexual relations with Victim A after they moved to Illinois; and that when they moved from Indiana to Illinois, the defendant intended to continue having sexual relations (namely, sexual intercourse) with Victim A. *Id.* at 31-32.

---

[4] Once again, the defendant answered in the affirmative, when the Court asked him later in the hearing, "You understand, one more time, that I am going to determine the sentence in this case and what the sentence will be ultimately rests with me? Do you understand that?" Plea Tr. (ECF No. 115) at 34.

At the conclusion of the change of plea colloquy, and prior to the Court's acceptance of the defendant's guilty plea, the defendant once again confirmed that: (1) he wished to plead guilty because he was, in fact, guilty of the charge; (2) he made the decision to plead guilty because he thought it was in his best interest to do so rather than going to trial; and that (3) his decision to plead guilty was entirely voluntary and no one promised him anything about his eventual sentence. *Id.* at 33-34.

### 4.    *Sentencing*

On January 23, 2015, the Probation Officer issued a Presentence Investigation Report ("PSR").[5] ECF No. 94. The Probation Officer calculated the defendant's adjusted offense level as 34, based on (1) a base offense level of 24, pursuant to U.S.S.G. § 2G1.3(a)(4); (2) an increase of two levels, pursuant to U.S.S.G. § 2G1.3(b)(1)(B), because the victim was in the defendant's custody, care, or supervisory control; (3) an increase of two levels, pursuant to U.S.S.G. § 2G1.3(b)(4)(A), because the defendant's offense involved the commission of a sex act or sexual contact; (3) an increase of eight levels, pursuant to U.S.S.G. § 2G1.3(b)(5)(A) and (B), because the rape and sexual assault involved a minor who had not yet attained the age of 12 years (predicated on what the government characterized as relevant conduct that predated the offense of conviction); and (4) a decrease of two levels, pursuant to U.S.S.G. § 3E1.1, based on the defendant's acceptance of responsibility. PSR at ¶¶ 26-42. Coupled with criminal history category V (PSR at ¶ 54), this resulted in an advisory Guidelines range of 235 to 293 months' imprisonment, capped at 10 years because of the statutorily authorized maximum sentence under

---

[5]   At the conclusion of the March 30, 2015 sentencing hearing, the district court directed the Probation Officer to amend the PSR to include factual changes concerning the defendant's marital status, residency, and the date of his arrest and placement into custody. These changes are reflected in the Corrected PSR, dated March 31, 2015. As noted above, all citations to the PSR in the government's response are to the Corrected PSR.

18 U.S.C. § 2421 (PSR at ¶ 88). Accordingly, the PSR calculated the advisory guideline term of imprisonment to be 120 months, pursuant to U.S.S.G. § 5G1.1(a). PSR at ¶ 88.

Paragraphs 58-84 of the PSR detailed the defendant's personal characteristics and background, including information provided by the defendant and his daughter, E.J., about topics such as the defendant's troubled childhood (PSR at ¶ 65), "emotional problems and anger management issues (*Id.*)," limited education because of a claimed learning disability, and limited fluency in English (PSR at ¶¶ 80-82). The PSR also addressed the defendant's mental and emotional health and the defendant's participation "in mental health treatment (depression) in 2013" while in custody. PSR at ¶ 75. The defendant told the Probation Officer that he took "three anti-depressants, which effectively treat his depression," and the defendant added that "he likely suffered from depression for most of his life" but was never able to get help. *Id.* According to the Probation Officer, the defendant "did not exhibit any speech, gestures, or behavior during his presentence interview" that "would suggest mental or emotional impairment." PSR at ¶ 76. E.J., the defendant's daughter, told the probation officer that the defendant is a "'completely different person' since he has begun receiving mental health treatment while in custody." PSR at ¶ 65.

In his sentencing memoranda on behalf of the defendant (ECF No. 98) (and at the sentencing hearing), Mr. Schindler, objected to the PSR's Guidelines calculation and certain other facts included in the PSR and, ultimately, requested a below-Guidelines term of imprisonment of 60 months. Doc. 98 at 1-8. Specifically, the defense sentencing brief challenged the application of an 8-level enhancement under U.S.S.G. § 2G1.3(b)(5)(A) and (B) and argued that the defendant should be eligible for an additional acceptance point pursuant to U.S.S.G.

§ 3E1.1(b). Mr. Schindler also objected to the inclusion in the PSR of a 1989 conviction in the defendant's criminal history. Doc. 98 at 8; PSR at ¶ 48.

Mr. Schindler argued multiple mitigating factors on the defendant's behalf. In the defendant's sentencing memorandum, counsel noted that the defendant has "admitted his offense and take[n] personal responsibility for his actions." Doc. 98 at 11. Counsel averted to the defendant's limited education and lifetime as a diligent laborer. *Id*. Counsel further argued that the Court take into consideration the defendant's issues with alcohol, substance abuse, and depression.[6] *Id*. at 12. He also described the defendant as a "model prisoner" during incarceration who had "presented no disciplinary problems." *Id*. at 14. In addition, counsel argued that the Court should take into consideration when determining an appropriate length of sentence that the defendant would incur additional months of custody "while he is being processed for deportation back to Mexico" and the fact that the defendant had been in custody since 2010. *Id*. at 11, 14. Finally, other mitigating factors cited by counsel were costs of incarceration and the defendant's family members, some of whom wrote letters on the defendant's behalf. *Id*. at 15; Def's Sent. Mem., ECF No. 98-1 at 1-4.

The court held a sentencing hearing on March 30, 2015. ECF No. 102; S. Tr. (ECF No. 116). At the hearing, the court sustained the defendant's objection to the imposition of an eight-level enhancement under U.S.S.G. § 2G1.3(b)(5)(A), *see* Sent. Tr. (ECF No. 116) 7-17, 19-21, but otherwise adopted the PSR's sentencing calculations, resulting in an advisory Guidelines range of 110 to 137 months' imprisonment, which was capped at the statutory maximum of 120 months. *Id*. at 21.

---

[6] Although the defendant's motion states that the defendant suffers from Attention Deficit Disorder ("ADD") in addition to depression (Motion, ECF No. 1, at 14 n.16), no information concerning ADD surfaced in the course of the proceedings in the criminal case. There is no indication in the record that the defendant ever made this claim before filing his motion.

At the sentencing hearing, the defendant's counsel again reiterated mitigating arguments, including the defendant's "depression and alcohol," which counsel asked the "court to take into consideration." *Id*. at 32-33. Mr. Schindler again asked the court to factor in that the defendant had already been in custody for years on other charges and that, "once [the defendant] completes his time of imprisonment, he will be deported," and will face additional time in custody awaiting deportation. *Id*. at 34-35.

During the defendant's allocution at the sentencing hearing, the defendant cited his immigration status and age and that he is "not planning to come back to the United States ever again because I am old now." *Id*. at 36. The defendant also asked the Court to consider his diminished "mental capacity" and issues related to his mental health and treatment. *Id*. The defendant told the Court that, although his "mental illness has been something very serious," that "with the medication, [he is] feeling a lot better." *Id*. at 35-36.

Before imposing the sentence, the Court acknowledged the various mitigation arguments raised by the defendant's counsel (or that were otherwise made known to the court during sentencing proceedings), including that the defendant "had little formal education growing up" and "has been willing to work hard to make a living." *Id*. at 43. The court also pointed to expressions of support from the defendant's family and that the defendant had already "had an extensive period of custody." *Id*. The court rejected, however, the argument that alcoholism could either explain or excuse the defendant's conduct. *Id*. at 44. Concerning the defendant's mental health arguments, the court stated:

> With respect to defendant's mental health issues, I don't think either side disputes and I don't think the government is disputing that the defendant has been prescribed medication that is for the purpose of treating depression, but there's no record to establish in any way that mental health issues are responsible or mitigate the defendant's conduct in this case. And going back to my point, the defendant has had the ability to have social interactions and social relationships with family

members that conform to the norms expected in society, so I question whether mental health issues are responsible for selectively conforming to societal norms. In any event, to the extent that defendant has suffered from depression, and I will certainly factor this into the equation in terms of recommendations for continuing treatment . . . but what the record doesn't support at this point is any inference that defendant's conduct was driven by or the product of mental illness.

*Id.* at 44-45.

The Court sentenced the defendant to a within-Guidelines sentence of 120 months' imprisonment. *Id.* at 48.[7]

### 5.     *The Defendant's Appeal*

On April 2, 2015, the defendant filed a timely notice of appeal. ECF No. 107. New counsel was appointed to represent the defendant on appeal. *See United States v. Jaimes-Moreno*, Case No. 15-1718 (7th Cir. 2015) (App. Doc. 4). After reviewing the record of the proceedings in this court, and consulting with defendant Jaimes-Moreno,[8] the defendant's new appellate counsel raised only one issue on appeal, namely "whether the imposed condition of supervised release requiring him to 'refrain from possessing a firearm, destructive device, or other dangerous weapon' is unconstitutionally vague." (App. Doc. 10, 20). No argument was made concerning competency, psychological evaluations, the import of the Sentencing Guidelines, or lack of mitigation at sentencing. In its non-precedential order, issued on December 8, 2015, the Seventh Circuit rejected the defendant's challenge to the supervised release condition and affirmed the defendant's sentence. *See* Case No. 15-1718 (App. Doc. 20).

---

[7] The defendant's sentence in this case runs from August 29, 2013. 3/30/15 Tr. (ECF No. 116) at 9-11; PSR at 1.

[8] *See* Motion for Extension of Time, App. Doc. 6, Aff. at ¶ 5; Motion for Extension of Time, App. Doc. 8, Aff. at ¶¶ 3, 5-6.

### 6.    *The Defendant's Section 2255 Motion*

On August 1, 2016, the defendant filed a timely *pro se* Petition to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 followed by a motion to amend his petition and moved for appointment of counsel. 16 CV 07776 (ECF Nos. 1, 4). In general, the defendant's affidavit to his motion claims that his trial counsel, Mr. Schindler, did not explain the sentencing guidelines; that the defendant did not know to what charge he was pleading; that he told his attorney that he suffered from attention deficit disorder; that he has suffered from depression; and that his attorney assured him that he would receive a sentence of four to five years. *See* 16 CV 07776 (ECF No. 1) at 41-42. The motion also asserts a claim founded upon *Johnson v. United States*, 135 S. Ct. 2551 (2015) (holding residual clause of the Armed Career Criminal Statute, 18 U.S.C. § 924(e)(2)(B)(ii) ("or otherwise involves conduct that presents a serious potential risk of physical injury to another"), to be unconstitutionally vague).

Thereafter, the defendant moved for leave to amend his petition, primarily to supplement the original petition with two affidavits from his mother and daughter; their affidavits state, among other things, that the defendant "suffered from mental issues," such as a learning disability and Attention Deficit Hyperactivity Disorder ("ADHD").[9] 16 CV 07776 (ECF No. 7, Ex. A and Ex. B) at 5-8. The affidavits reflect, however, that the defendant was never diagnosed with ADHD (or ADD). See id., Ex. A ("I was not able to have psychiatric examination on my son"); Ex. B ("It is known within my family that my father suffers from [ADHD]."). Neither of the affidavits indicates that Mr. Schindler was ever advised that the defendant suffered from ADD or ADHD.

---

[9] The Court initially denied the motion to amend because it had been filed by the defendant *pro se* after the Court had appointed counsel for him. 16 CV 7776 ECF No. 8. Ultimately, however, the Court granted the motion after appointed counsel sought to withdraw. 16 CV 7776 ECF No. 19.

The Court granted defendant's motion for appointment of counsel and attorney Joshua B. Adams was appointed from the CJA panel. 16 CV 07776 (ECF Nos. 9, 12). Mr. Adams duly contacted the defendant and began reviewing the record in the underlying case. *See* 16 CV 7776 (ECF Nos. 10-12). On February 13, 2017, only two weeks after the first status hearing at which Mr. Adams appeared, the defendant sent a letter to the Court in which he contended that Mr. Adams had advised him that the Court had denied his § 2255 petition as to "the *Johnson* issue" "[a]nd that nothing else from this point forward could be done for me." 16 CV 7776 (ECF No. 14). Based on Adams' purported indifference to his plight, the defendant asked to proceed *pro se*. *Id*. At an ensuing status hearing held on March 3, 2017, Mr. Adams advised the Court that he had not told the defendant that his § 2255 motion had already been denied and had already responded in writing to the defendant regarding his concerns. *See* 16 CV 7776 (ECF No. 18, at 3). The Court received another letter from the defendant on March 24, 2017 inquiring as to a response to his earlier letter. In light of that response, the Court directed the government to respond to the defendant's petition, as amended. Shortly thereafter, the Court received another letter from the defendant seeking to proceed *pro se*. 16 CV 7776 (ECF No. 20). At a status hearing on June 13, 2017, Mr. Adams orally moved to withdraw from the matter, stating that he was ethically unable to make any filings on the defendant's behalf because he did not believe that the defendant's claims had any arguable merit. Accordingly, the Court relieved Mr. Adams of any obligation to submit any filings on the defendant's behalf absent further order. The defendant subsequently filed a *pro se* reply to the government's response brief.

## II.    DISCUSSION

### A.    Applicable Standards

In the defendant's *pro se* § 2255 motion and filings, which are to be construed liberally, *see Beal v. Beller*, 847 F.3d 897, 902 (7th Cir. 2017), the defendant argues that his trial counsel

provided constitutionally ineffective assistance of counsel due to errors attendant to the defendant's guilty plea and sentencing. To establish constitutionally ineffective assistance of trial counsel in violation of the Sixth Amendment, the defendant must show that (1) his trial attorney's performance "fell below an objective standard of reasonableness," informed by "prevailing professional norms" and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). "To reflect the wide range of competent legal strategies and to avoid the pitfalls of review in hindsight, [the Court's] review of an attorney's performance is highly deferential and reflects a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014) (citation omitted); *see also Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017) (courts apply a "'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.") (citation omitted). To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding," instead the defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Carter v. Butts*, 760 F.3d 631, 635 (7th Cir. 2014) (citation omitted). "[B]ecause counsel is presumed effective, a party bears a heavy burden in making a winning claim based on ineffective assistance of counsel." *Shell v. United States*, 448 F.3d 951, 955 (7th Cir. 2006) (citation omitted).

Second, in the context of a guilty plea, the Supreme Court has articulated that "a defendant who pleads guilty upon the advice of counsel may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received was constitutionally ineffective." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quotations omitted).

Moreover, in the guilty plea context, to demonstrate prejudice under the prejudice prong of the *Strickland* standard, a defendant must show that but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Bethel v. United States*, 458 F.3d 711, 716–17 (7th Cir. 2006).

Third, in the context of sentencing issues, a "showing that counsel's errors had 'some conceivable effect on the outcome of the proceeding' is not sufficient to demonstrate prejudice." *United States v. Ruzzano*, 247 F.3d 688, 696-97 (7th Cir. 2001) (citation omitted). Although the Supreme Court's admonition that any additional time in prison can constitute prejudice, a defendant must still show a reasonable probability that he received additional prison time because of counsel's error. *Id.* (citing *Glover v. United States*, 531 U.S. 198 (2001)). In deciding whether a particular error prejudiced the defendant, "a court should presume . . . that the judge . . . acted according to law." *Id.* (citing *Strickland*, 466 U.S. at 695).

### B.    Ineffective Assistance of Counsel Claims

Although it is not the first ground enumerated in the defendant's motion, his primary claim is that his attorney rendered ineffective assistance because he failed to investigate the defendant's background history, mental health, and cognitive abilities, which, in the defendant's view, would have caused his attorney to move for an evaluation of the defendant's competency. *Id.* at 29-30. The defendant also contends that his attorney's assistance was ineffective because his attorney allegedly "failed to advise [the defendant] of the repercussions of the Federal Sentencing Guidelines and Related Enhancements" and that his attorney used purported "coercion and scare tactics" and/or promises of a 3-4 year sentence to obtain the defendant's agreement to plead guilty. *Id.* at 26, 28. The defendant therefore claims that he was prejudiced because he was unable "to make an informed decision whether to plead guilty or proceed to

trial." *Id*. at 26. The defendant further contends that he was prejudiced by his attorney's ineffective assistance during the sentencing phase because his attorney allegedly did not raise certain mitigation arguments, including regarding the defendant's depression and background (such as his age and eventual deportation). *Id.* at 32-33.

### 1. *Competency and Psychological Evaluation*

As to competency, the defendant essentially argues that he was not competent to plead guilty and that his counsel was ineffective for failing to move for a competency hearing. To be competent to stand trial or give a guilty plea, the defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding [and] a rational as well as factual understanding of the proceedings against him." *United States v. Ewing*, 494 F.3d 607, 622 (7th Cir. 2007) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960); *Burt v. Uchtman*, 422 F.3d 557, 564 (7th Cir. 2005) ("the standard governing competency to plead guilty is the same as that used to evaluate competency to stand trial"). And in the context of an ineffective assistance of counsel claim, "[w]here a defendant argues that he should have received a fitness hearing, [the Seventh Circuit has] interpreted the prejudice inquiry as asking whether there is a reasonable probability the defendant would have been found unfit had a hearing been held." *Burt v. Uchtman*, 422 F.3d 577, 564, 567 (7th Cir. 2005) ("defendant must also be competent at the time he pleads guilty, and the standard governing competency to plead guilty is the same as that used to evaluate competency to stand trial.").

The record does not give rise to a reasonable inference that the defendant was not competent to enter a plea of guilty. At no point prior to the defendant's plea of guilty did any issue surface that cast doubt on the defendant's ability to understand the nature of proceedings against him or to meaningfully assist counsel. *See, e.g., United States v. Clements*, 522 F.3d 790,

796 (7th Cir. 2008) (competency evaluation not required in part because record was devoid of evidence of "irrational" behavior). The record reflects no failures of comportment by the defendant, no odd or inexplicable conduct, and no irrational, nonresponsive, or impulsive statements or arguments. The motion identifies no conduct whatsoever that suggests that the defendant did not understand what was occurring or that he was unable to meaningfully participate in his defense.

To the contrary, the record establishes that the defendant actively participated in his defense. Even before he pled guilty, for example, the defendant filed several *pro se* motions seeking the appointment of new counsel (ECF Nos. 31 and 52); those motions reflected significant engagement with his defense. *See Eddmonds v. Peters*, 93 F.3d 1307, 1318 (7th Cir. 1996) (citing the filing of a motion for substitution of counsel as evidence of defendant's engagement in his defense). Further, the Court had the opportunity to assess the defendant's mental competence during several pretrial hearings, and found that the defendant's participation in the discussions was appropriate, articulate, and reflected an understanding of the substance of the discussions. *See United States v. Anzaldi*, 800 F.3d 872, 879 (7th Cir. 2015) ("The district court was also entitled to rely on all of its informal observations of [defendant] over the course of two years, during which time [defendant] exhibited no behaviors suggestive of mental illness); *Yu Tian Li v. United States*, 648 F.3d 524, 532-33 (7th Cir. 2011) (no hearing on a § 2255 motion required where judge deciding the motion also presided over underlying case and had opportunity to assess defendant's understanding with his own observations); *United States v. Weathington*, 507 F.3d 1068, 1073 (7th Cir.2007) (finding district court entitled to "determine informally whether reasonable cause exists by observing the defendant's demeanor and assessing his statements during ... interactions with the court.").

The Court first addressed the defendant's mental condition directly on August 21, 2014, when the defendant requested a bench trial. During the colloquy to determine whether he was knowingly and voluntarily waiving his right to a jury trial, his attorney informed the Court that the defendant was on a variety of medications and that the defendant wanted to discuss that issue with the Court. When the Court turned to that subject, and asked the defendant whether he felt that the medications he was taking would affect his ability to make important decisions, he stated: "I am taking psychiatric medication, but I do not believe that that would affect me." 8/21/14 Tr. (ECF No. 117) at 17. After further questioning about the nature of the medications, the defendant related that the medication "helps me relax, and I feel better after I take it" and that "it improves" his ability to think and reason. *Id.* at 18-19. He then clarified that he had raised the issue of the medications only because "***before I started taking medication . . . I felt like I was incapable or incompetent,***" but that taking the medication had helped him. *Id.* at 19 (emphasis added). This portion of the colloquy ended with the defendant's confirmation that he was having no difficulty understanding the discussion with the Court. *Id.* Beyond these specific statements by the defendant, the Court found no basis during the remainder of the 20-minute colloquy to question the defendant's competence. And indeed, given the nature of the charge and the evidence against him (which showed that the defendant had continuously raped the minor victim over the course of at least three years), the fact that the defendant sought a bench trial was itself probative of his competence to understand what he was doing and his meaningful participation in his defense. *Balfour*, 892 F.2d at 561 (citing decision to waive jury trial as evidence of competence).

About two months later, the defendant pled guilty to a superseding information. It is particularly noteworthy, and indicative of his engagement in his defense and his understanding of

the proceedings, that the defendant himself initiated the negotiations that resulted in reaching an agreement with the government. 10/22/14 Tr. (ECF No. 114) at 2. This was not a process that in which the defendant was simply swept along oblivious to what was happening; he was an active participant and was not reluctant to raise issues on his own when he was not satisfied that his counsel was addressing them. Moreover, the plea bargain that was negotiated was one that provided a substantial benefit to the defendant, namely the opportunity to plead to a charge that eliminated his exposure to a 10-year mandatory minimum sentence and carried a 10-year maximum on the sentence in lieu of the maximum of life imprisonment on the charge on which he had been indicted.

At his change of plea hearing, over the course of a colloquy that lasted more than 45 minutes, the court expressly determined that the defendant was competent to plead guilty. 10/23/2014 Tr. (ECF No. 115) at 11. During the court's questioning, the defendant again informed the court that he had been prescribed several medications for his depression while incarcerated in the MCC. *Id.* at 9. And again, the defendant also told the court that these medications did not adversely affect his ability to understand or think. *Id.* at 9-10. To the contrary, the defendant stated that the medications improved his ability to think clearly. *Id.* at 10. Thereafter, the defendant confirmed unequivocally that he understood the proceedings and the plea declaration. *Id.* at 6-8. The court also asked the defendant's counsel and the Assistant United States Attorney if they had any doubt to the defendant's competency to plead guilty, to which they answered no. *Id.* at 11. Indeed, the defendant's attorney stated that he "believe[d] he [defendant] is more lucid today than he has ever been in his life." *Id.* at 11. Based on that record and the answers to its own questions, the court concluded that the defendant was competent to offer a guilty plea in this matter. *Id.* The defendant also informed the court that he had had

enough time to talk to his counsel about his guilty plea and that he understood the nature of the charge against him. *Id.* at 5-7. Over the course of the colloquy, the defendant listened carefully and answered appropriately, sometimes affirmatively, sometimes negatively, and sought clarification on several occasions when he had not understood a question. *See, e.g., id.* at 24 and 33. The defendant exhibited no behavior that suggested in any way that he did not fully understand the nature of the proceedings.

In addition, the PSR reported that the defendant had also confirmed to the Probation Officer that he had been prescribed three anti-depressants, that they were effective in treating his depression, and that the defendant "did not exhibit any speech, gestures, or behavior during his presentence interview . . . that would suggest mental or emotional impairment." PSR ¶¶ 75-76. Further, the PSR related that the defendant's daughter had also confirmed that the defendant's mental health improved notably after he began receiving treatment in approximately 2013, and that he was "a completely different person" since he had begun receiving treatment. *See* PSR at ¶ 65.

It is also noteworthy that not one of the attorneys appointed to represent Mr. Jaimes-Moreno found any reason to question his competence to plead guilty. Prior to the defendant's plea, Mr. Schindler had represented Mr. Jaimes-Moreno for almost a year and, far from observing any reason to question the defendant's competence, considered the defendant to be more lucid than he had ever been when he entered his plea. On appeal, Mr. Schindler was replaced by counsel appointed by the Court of Appeals; that attorney, after consultation with the defendant and review of the district court record, found no basis to question the defendant's competence to plead guilty and appealed only the imposition of a condition of supervised release. This court appointed yet another attorney for the defendant upon the filing of his § 2255

motion. That attorney, Mr. Adams, reviewed the plaintiff's petition, consulted with the defendant, and like the other attorneys before him, concluded that there was no basis to the defendant's claim that a competency hearing was indicated.

The defendant's motion cites no evidence to suggest that a hearing was indicated other than the fact that the defendant was taking antidepressant medication when he pled guilty. That fact, standing alone, does not give rise to a bona fide doubt as to his competence to enter that plea. *Rever v. Acevedo,* 590 F.3d 533, 538 (7th Cir. 2010) ("not every mental illness demonstrates incompetence to stand trial"). "Simply suffering from depression, and taking anti-depressants for that condition, does not suggest that [defendant] was legally incompetent during the proceedings." *Girard v. United States*, No. 16-12781-E, 2017 WL 5624882, at *4 (11th Cir. June 14, 2017). *See also Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000) ("the fact that the petitioner has been treated with anti-psychotic drugs does not per se render him incompetent to stand trial").

As the Seventh Circuit has explained, "[t]he Constitution does not necessarily forbid trial of the mentally ill. Not every manifestation of mental illness demonstrates incompetence to stand trial; rather the evidence must indicate a present inability to assist counsel or understand the charges. The issue is not mental illness, but whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996) (internal quotations and citations omitted); *see also United States ex rel. Foster v. DeRobertis*, 741 F.2d 1007, 1012 (7th Cir.1984) ("Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges."). For that reason,

the mere fact that a defendant is mentally ill or was taking anti-psychotic medication does not require a competency evaluation. *See, e.g., Balfour v. Haws*, 892 F.2d 556, 559-62 (7th Cir. 1989) (in light of evidence of defendant's understanding of, and participation in, pretrial and trial proceedings, no competency evaluation required despite prior inpatient and outpatient treatment for unspecified "psychiatric problems" and defendant's continued prescription for anti-psychotic medication).[10]

This is not a case, it should be noted, in which the defendant had just been put on medication, or where new medication was being evaluated, or where it was claimed that the defendant was not receiving medication consistently—factors that might raise an issue about the effectiveness of the medications and the defendant's competence notwithstanding the medication. *See, e.g., Anderson v. United States*, 865 F.3d 914, 920-21 (7th Cir. 2017) (hearing required where defense counsel knew but did not timely disclose that defendant was not receiving prescribed medications on a regular basis); *McManus v. Neal,* 779 F.3d 634, 638-39 (7th Cir. 2015) (hearing required after regimen of anti-psychotic drugs was administered to defendant on an emergency basis after defendant experienced panic attacks during trial); *Burt v. Uchtman*, 422 F.3d 557, 565-66 (7th Cir. 2005) (evaluation required in part due to "heavy and ever-changing doses of psychotropic medication" and evidence that medications were not being provided consistently). *Compare Warren v. Baenen*, 712 F.3d 1090, 1100-01 (7th Cir. 2013) (no

---

[10] Apart from the fact that there is no precedent requiring competency evaluations based solely on the fact of a mental illness for which psychotropic medications have been prescribed, such a requirement would risk overtaxing the resources available to conduct such evaluations. More than one third of federal prisoners report diagnoses of mental health disorders. *See* Jennifer Bronson & Marcus Berzofsky, Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011–12, U.S. Dep't of Justice, Bureau of Justice Statistics (June 2017) at 1, www.bjs.gov/content/pub/pdf/imhprpji1112.pdf (last visited December 8, 2017). And nearly 25% of those diagnosed with a mental disorder had been diagnosed as having major depressive disorder, a larger percentage than any other mental disorder. *Id*. at 3.

ineffective assistance in failing to request competency evaluation where defendant had been diagnosed with "Major Depression with Psychotic Features" and was prescribed medication where, unlike *Burt*, there was no evidence of inconsistent administration of medication, "demonstrated belligerent or explosive behavior," or impulsive decision-making that adversely affected defendant's position in the litigation); *Rever*, 590 F.3d at 538 (finding that increase in the dosage of defendant's medication, on its own, is not sufficient evidence to rebut the state court's finding [of competence]" and distinguishing *Burt* as a case that included evidence of incompetence in addition to "ever-changing doses of psychotropic medication"). Here, the evidence indicates that the defendant had been receiving medication consistently for the duration of his federal pretrial detention before he pled guilty and that changes wrought by that medication were entirely positive.

In short, the defendant repeatedly advised the court that the medications he was taking were effective and that he understood what he was doing. Neither the court, nor defendant's counsel in the criminal case, nor his appellate counsel, nor counsel appointed to assist him with this motion, nor the prosecutor, nor the probation officer, nor the defendant's family, found any reason to question the defendant's assessment. Based on this record, the Court finds that defense counsel was not ineffective for failing to request a competency hearing for the defendant. There is no evidence of record that the defendant did not have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," which is the measure of competency. *Dusky v. United States*, 362 U.S. 402, 402 (1960). To the contrary, the record establishes that his attorney concluded that, due to the mental health treatment he had received while in custody at the MCC, the defendant was more lucid than he had ever been in his life—an assessment shared by the defendant's own daughter.

For the same reasons, there was no basis for the Court to order a competency hearing *sua sponte*. In deciding whether to order a competency examination, a district court is "entitled to consider the statements made by both [the defendant] and . . . counsel affirming [the defendant's] ability to understand the charges against her and to assist in her defense." *United States v. Anzaldi*, 800 F.3d 872, 878 (7th Cir. 2015). *See also United States v. Ross*, 510 F.3d 702, 712 (7th Cir. 2007) ("it is quite telling that not one of [defendant's] three trial attorneys suggested a competence problem; rather, they found him a difficult, but not incompetent, client"); *United States v. Savage*, 505 F.3d 754, 760 (7th Cir.2007) ("Significant weight is given to counsel's representations concerning his client's competence and counsel's failure to raise the competency issue."); *United States v. Morgano*, 39 F.3d 1358, 1374–75 (7th Cir.1994) (district court entitled to rely on statements made by pro se defendant and his standby counsel to support finding no reasonable cause existed to believe defendant was mentally incompetent); *United States v. Collins*, 949 F.2d 921, 926 (7th Cir. 1991) (even where defendant had previously been found not competent in prior case, district judge "was entitled to rely on counsel's, and [defendant's] own statements, that he was competent. Those are the two parties most familiar with the defendant's mental state.").

It is clear, moreover, that the basis of the defendant's claim that a competency evaluation was required is not that he was not competent to plead guilty, but that his mental illness had contributed to his criminal conduct. *See, e.g.*, Reply, ECF No. 24, at 6 ("there is no doubt that this Petitioner suffered depression ***during his times in which the criminal events occured*** [sic]") (emphasis added); 8/21/14 Tr. (ECF No. 117) at 19 ("***before I started taking medication*** . . . I felt like I was incapable or incompetent") (emphasis added). That defendant's depression was previously untreated, however, is not germane to the question of his competence during the

relevant proceedings; competence is a question of the defendant's mental state at the time of the proceeding, not in years past. *United States v. Woodard*, 744 F.3d 488, 493 (7th Cir. 2014) (issue is "whether the defendant currently suffers, at the time the motion for a competency evaluation is made, a malady that would render the defendant incompetent, not whether a malady affected the defendant years in the past"); *United States v. Morgano*, 39 F.3d 1358, 1374 (7th Cir. 1994).

To say that on this record that a competency hearing was required would be to say that there must be a competency evaluation in any case in which a defendant is taking antidepressant medications, regardless of whether there is any evidence suggesting that the defendant did not understand what was happening or was not participating meaningfully in his defense. As noted above, there is no such rule.

Even if a competency evaluation was indicated, the defendant has failed to establish the prejudice prong of his ineffective assistance of counsel claim because there is not a "reasonable probability" that the Court would have found him unfit had the Court conducted a competency hearing. *See Burt*, 422 F.3d at 567. "[A] fitness hearing is not an end in itself. Its function is to ensure that the defendant is competent to assist in his own defense at trial. Thus, the improper denial of a fitness hearing can be harmless under *Strickland*. . . . Only if there is a reasonable probability that [the defendant] was not fit, calling into question the integrity of the adversarial process, will 'confidence in the outcome' of the trial be deemed undermined for purposes of an ineffective assistance claim under *Strickland*." *Eddmonds v. Peters*, 93 F.3d 1307, 1316–17 (7th Cir. 1996).

Here, there is no reasonable probability that the defendant was not able to assist in his own defense. Again, although the defendant was taking antidepressants, nothing that occurred during the prosecution of this case raised any doubt about the defendant's competence to assist in

his own defense. *See, e.g., Warren*, 712 F.3d at 1100 (no reasonable probability that defendant would have been found unfit even though he had been diagnosed with mental illness and prescribed medication in light of evidence that he understood the proceedings and provided assistance to his lawyer in connection with his guilty plea). Rather, the record shows a defendant who was actively engaged in his defense and who was not in the least reluctant to complain about the efforts of his attorney on his behalf or to raise issues with the Court directly. It was abundantly clear that defendant had the desire and ability to consult with his lawyer and that he understood the proceedings and charge against him. *See Ewing*, 494 F.3d at 622. Thus, the defendant's arguments based on his competency to give his guilty plea fail.

### 2.  *Counsel's Description of the Role of the Sentencing Guidelines and Supposed Use of Coercion and Promises*

The defendant also claims that his attorney was ineffective because he allegedly "failed to advise that the federal Guidelines would play such an integral part of the sentence he would receive." 16 CV 07776 (Doc. 1) at 26. According to the defendant, "had a detailed explanation of the guidelines and the charges been provided[,] he would have never ignorantly plead to such a complicated case." *Id.* Moreover, the defendant alludes to his attorney's unsubstantiated "[c]oercion and scare tactics" which, he claims, were apparently intended to extract a plea as well as an "off record verbal promise" from the attorney that defendant would somehow receive a "lenient 3 to 4 year sentence." *Id.* at 28. However, as with the defendant's other claims, the defendant alleges no facts and no supporting evidence to support such claims of ineffective assistance.

More problematic still, the defendant's allegations are contradicted by the record, including by the defendant's own statements under oath, in which he previously affirmed that

there was no coercion, no promised sentence, and that the defendant understood the role the sentencing guidelines and calculations. The defendant's own statements betray his claims.

To begin, the defendant's claim that Mr. Schindler used coercion and scare tactics to convince him to plead is belied by the fact that it was the defendant, not Mr. Schindler, who reinitiated plea discussions with the government at the outset of the pretrial conference. After the defendant, at the very outset of the hearing announced that "I have a petition. I wanted to ask if I may request a petition to the Court," Mr. Schindler explained that the defendant was seeking more time for plea negotiations with the government. That request prompted a further conference between the parties which resulted in an agreement that provided a substantial benefit to the defendant by permitting him to resolve the case through a plea to a charge that carried only a ten-year maximum sentence and no mandatory minimum sentence rather than go to trial on a charge that carried a ten-year minimum and a maximum sentence of life imprisonment. Two days later, when the defendant pled guilty to the reduced charge, he expressly and repeatedly acknowledged that no one had forced or coerced him into pleading guilty:

Court:            Did anyone force you to sign that plea declaration?

Defendant:     No.

Court:            All right. Did anyone exert pressure on you—other than the fact that you were facing trial on a different charge, did anyone try to exert any pressure on you to get you to sign that document?

Defendant:     No.

Court:            All right. Did you sign that document because you thought it was the best thing for you to do given your current circumstances?

Defendant:     Yes.

* * * * *

| | |
|---|---|
| Court: | Now, in making that decision [to plead guilty], has anyone forced you in any way to—or done anything to threaten you in any way to plead guilty? |
| Defendant: | No. |
| Court: | Has anyone promised you anything . . . at all in order to convince you to plead guilty to the charge in the information? |
| Defendant: | No. |
| Court: | Are you—do you wish to plead guilty to that charge because you are, in fact, guilty of that charge? |
| Defendant: | Yes. |
| Court: | Do you wish to plead guilty to that charge because you think it is the best thing for you to do, given the circumstances you are in now? |
| Defendant: | I didn't understand. |
| Court: | What I want to make sure of is that you are making this decision because you think it's the best thing for you to do rather than go to trial? |
| Defendant. | Yes. Yes. |
| Court: | Is your decision to plead guilty entirely voluntary? |
| Defendant: | Yes. |

10/23/14 Tr. (ECF No. 115) at 23:5-16; 33:7 – 34:5. This record amply rebuts the defendant's claim that his attorney coerced him into pleading guilty.

Further, the defendant expressly and repeatedly acknowledged that no one had promised him what his sentence would be, putting the lie to his claim that his attorney promised him that he would receive a sentence of only three to four years:

| | |
|---|---|
| Court: | Has anyone promised you what the sentence in this case will be if you plead guilty in this case? |
| Defendant: | No. |

* * * * *

| Court: | So do you understand that no one—Mr. Schindler, not the government, not even me at this point—can tell you what your sentence in this case is going to be yet? Do you understand that? |
|---|---|
| Defendant: | Yes. |

* * * * *

| Court: | Has anyone promised you anything about what the sentence in this case will be? |
|---|---|
| Defendant: | No. |
| Court: | All right. You understand, one more time, that I am going to determine the sentence in this case and what the sentence will be ultimately rests with me? Do you understand that? |
| Defendant: | Yes. |

*Id.* at 23:23–24; 25:9-13; 34:9-13. Indeed, the Court expressly told the defendant, who acknowledged that he understood, that "until we go through that whole process, I will not make a determination of what your sentence is, ***so if anyone has told you that you can expect a sentence of 10 years or a sentence of two years, they're wrong, and you can't rely on that. . . . Because no one can tell you what your sentence is going to be because I haven't decided what your sentence is going to be. Do you understand?***" *Id*. at 26:14-23 (emphasis added).

These acknowledgements that his sentence could range from very little prison time up to ten years of imprisonment also belie the defendant's claim that he would not have pled guilty had he understood what a significant role in sentencing the sentencing guidelines played. Further, the defendant acknowledged during his plea colloquy that he understood that the guidelines were not binding on the Court. After defense counsel indicated that the defendant might not understand the specific guidelines at issue, the Court explained, and defendant acknowledged that the guidelines would produce a recommended, but non-binding, sentence based on the facts of the case and the defendant's criminal history:

| Court: | And did he [Mr. Schindler] explain to you that based on the facts of the case and based on your criminal history category that there is a score produced that is a recommended sentence in the case? I want to make sure you understand that it is only a recommended sentence and that it is not binding on me. Do you understand that fact? |
|---|---|
| Defendant: | Yes. |

*Id*. at 25:5-8. In addition, in his plea declaration, filed with the court, the defendant expressly acknowledged that the anticipated guidelines range would be 100 to 125 months, capped at 120 months due to the statutory maximum sentence of ten years. Plea Decl., ECF No. 90, at 6.

These averments by the defendant show his claim that he did not understand the sentence he might receive to be not merely meritless, but false. And the Seventh Circuit has been clear that it is not permissible under the law for criminal defendants to gain from contradicting earlier sworn statements made at a plea hearing:

> Because many defendants seem to be under the misapprehension that a guilty plea is just provisional, and an oath to tell the truth means nothing, let us be clear ... Entry of a plea is not some empty ceremony, and statements made to a federal judge in open court are not trifles that defendants may elect to disregard. A defendant has no legal entitlement to benefit by contradicting himself under oath. Thus when the judge credits the defendant's statements in open court, the game is over.

*United States v. Stewart*, 198 F.3d 984, 987 (7th Cir.1999); *see also United States v. Price*, 988 F.3d 712, 717 (7th Cir. 1993) ("Voluntary responses made by a defendant when entering a guilty plea are binding."). Movants in § 2255 proceedings are likewise bound by the assertions they offer under oath during plea hearings. *Hugi v. United States*, 164 F.3d 378, 381 (7th Cir.1999) ("Courts take the plea process seriously and hold defendants to their representations.") (citation omitted).

Here, the defendant's contentions that underlie his ineffective assistance claims—namely, his supposed incompetency and whether he was coerced through threats and/or promises into pleading guilty or was otherwise not properly informed about the Sentencing Guidelines, are all

contradicted by the defendant's sworn statements during a lengthy plea colloquy. For the reasons set forth above in connection with his claim that he was not competent to plead guilty, the court rejects the claim that Mr. Jaimes-Moreno did not understand what he was saying and doing when he pled guilty. The defendant had many opportunities before the Court—under oath—to describe any issues relating to competency, coercion, or promises of a lenient sentence, and the defendant repeatedly affirmed that there were none.  As such, the law does not allow the defendant to cast those sworn statements aside when the sentence he received was not to his liking.

### 3.       *Investigation and Mitigation Arguments at Sentencing*

The defendant further argues that counsel was ineffective at sentencing because he failed to bring the defendant's mental health issues to the court's attention and failed to investigate or present evidence of the defendant's mental health problems. 16 CV 07776 (ECF No. 1) at 29-30. The record shows that this claim, too, is false. In the defendant's sentencing memorandum, his counsel discussed the defendant's mental health, including his history of depression. Sent. Mem., ECF No. 98, at 12, 14-15. The Presentence Investigation Report discussed the defendant's mental health history as well, reporting information provided by both the defendant and his daughter . *See* PSR at ¶¶ 65, 75-76. Moreover, at sentencing, the defendant's counsel expressly argued that the court should sentence the defendant below the guideline range, in part, because of the defendant's mental health history and condition. 3/30/15 Tr. (ECF No. 116) at 32-34. He also provided a list of the various medications the defendant was taking to further document his depression disorder. *Id*. at 37-39. It also bears noting that, in his allocution, the defendant himself addressed his mental health issue, acknowledging "that it's not an excuse," but arguing that with the effective medications he was receiving, he no longer posed any risk to the victim or others. *Id*. at 35-36 ("And now it looks like with the medication, I am feeling a lot better, and now I feel

more encouraged and I feel more able to continue having a much better life and a different life."). And finally on this point, the Court specifically addressed the defendant's mental health issues in the course of assessing the appropriate sentence to impose, *id.* at 43-45, a fact that shows that those issues were presented for the Court's consideration. Based on this information, the defendant's argument that counsel failed to bring his mental health history to the Court's attention and that counsel failed to investigate or present evidence of the defendant's mental health problems at sentencing are without a factual basis.

Relatedly, the defendant asserts that his attorney was ineffective for failing to investigate and then argue in mitigation in sentencing concerning a host of issues related to "the defendant's background history," such as his limited education and apparently having "Attention Deficit Disorder," as well as the defendant's lack of knowledge of the law and limited English. 16 CV 07776 (ECF No. 1) at 29-33. The defendant also asserts that his counsel failed to present as mitigation his age and that he will be deported. *Id.* at 33. These arguments have no merit, as the record shows that the Court was well aware of the fact that the defendant had limited education, was not a young man, and was subject to deportation after serving his sentence. See PSR at 2 and ¶ 59 (age), ¶¶ 51 and 53 (prior convictions for unlawful reentry), ¶ 69 (ICE confirmation of unlawful immigration status and warrant for removal), ¶¶ 80-82 (limited education and vocational training); 3/30/15 Tr. (ECF No. 116) at 30 ("not only was he here illegally, yet again, for I believe the third or fourth time"); at 34 ("I'd ask the Court to consider that once he completes his time of imprisonment, he will be deported"); 36 ("I am not planning to come back to the United States ever again because I am old now . . . I can still work . . . [but] not by the time I'm about 10 or 15 years older, then it would be too much, and right now is when I could overcome this").

The defendant also claims that he requested "to his attorney that he look into his past history of [Attention Deficit Disorder ("ADD")] and [the defendant's] attorney ignored this request." 16 CV 07776 (ECF No. 1) at 30 n.18. As noted above (*supra* Note 6), however, the defendant's claim to have suffered from ADD, or ADHD, is entirely unsubstantiated, and in fact the record belies the claim. The defendant asserts that this failure, "along with other irreconcilable differences," prompted the defendant to move the Court to substitute counsel. *Id.* at 30. However, a review of the defendant's previous motions to substitute counsel (and the ensuing hearings in March 2014 and August 2014, respectively) reveal no indication about the defendant's supposed ADD issues or his discussion about this with Mr. Schindler.

Plainly, these issues were presented to the Court, and they did not, in the court's view, warrant a sentence below the statutory maximum of ten years, which was a within guideline sentence. Further, even in light of these issues, the court was of the view that a longer sentence would have been appropriate but for the statutory cap. Indeed, in imposing sentence, the court stated that "it would difficult to overstate the seriousness of this offense" and that the defendant "violated the most basic norms of civilized conduct." 3/30/15 Tr. (ECF No. 116) at 40-41. There is, then, no prospect that further elaboration on these points would have had any material effect on the defendant's sentence, even if additional information or argument on these issues should have been presented. *Fuller*, 398 F.3d at 652; *Berkey*, 318 F.3d at 774.

## C. *Johnson Claim*

The defendant's final argument concerning *Johnson v. United States*, 135 S. Ct. 2551 (2015) is misplaced and appears to misconstrue *Johnson's* application to the defendant's case. 16 CV 07776 (ECF No. 1) at 34-35. The defendant appears to contend that "his prior state charges for guns and ammunition" were "deemed as crimes of violence" in contravention of

*Johnson*, where the Supreme Court held that the armed Career Criminal Act's residual clause (18 U.S.C. § 924(e)(2)(B)(ii) is unconstitutionally vague under the Due Process Clause. *Id.* at 35. The defendant's argument is off-the-mark because there is no indication from the record that any of his previous convictions were construed as crimes of violence in any way that implicated *Johnson*.

*      *      *

For the foregoing reasons, the defendant's motion pursuant to 18 U.S.C. § 2255 is denied. This is a final, appealable, order. The time permitted to file an appeal runs from today's date and is governed by Federal Rule of Appellate Procedure 4(a). Absent a basis for extension, the appeal must be filed in the District Court within 30 days. The court further concludes that the defendant has not made a substantial showing of the denial of a constitution right and so declines to issue a certificate of appealability. 28 U.S.C. § 2253(c)(2); Fed. R. App. P. 22(b).


Dated: December 11, 2017

_____
John J. Tharp, Jr.
United States District Judge